UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In Re: | : | Case No. 18-50955 |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | Chapter 7 |
|     Debtor | : | |
| VS | : | |
| | : | |
| | : | |
| PEOPLE'S UNITED BANK, N.A. | : | August 31, 2018 |
|     Movant | : | |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | |
| RICAHRD M. COAN | : | |
|     Respondents | : | |

## MOTION FOR RELIEF FROM STAY ( REAL PROPERTY)

The Movant, **PEOPLE'S UNITED BANK, NATIONAL ASSOCIATION,**

**(hereafter "the Movant"),** a secured creditor of the above-named debtor ("the debtor"), by

and through its undersigned attorneys, pursuant to 11 U.S.C. Section 362 (d) and

Bankruptcy Rule 4001, moves this Court for an Order affording relief from the automatic

stay imposed by 11 U.S.C. Section 362 (a)("Stay") with respect to property known as 62

Quail Run, Torrington, Connecticut (the "Property"), and as grounds therefore respectfully

represents the following to the Court:

    1. The Debtor filed a petition under Chapter 7 of the United States Bankruptcy

Code on July 27, 2018.

2.  The Movant is the holder of a secured home equity mortgage on the Property in the original amount of up to  $170,000, which mortgage was dated  June 28, 2006 and recorded August 9, 2006  in Volume 981 at Page 165 of the Torrington Land Records. The Movant is the owner and holder of the note and mortgage. A copy of the Note and Mortgage Deed are attached as Exhibits A.

3.  The Movant wishes to continue with a foreclosure action of said mortgage in the Litchfield Superior Court bearing Docket No. LLI-CV-18-6018239S.

4.  According to the attached appraisal, (Exhibit B) the value of the property was $228,000.00. According to the Debtor's Schedule A, the value of the property is $228,000.

5.  According to the Debtor's Statement of Intention, the debtor plans to surrender the property to the Movant.  A copy of the Statement of Intention is a attached as Exhibit C. The debtor claims an exemption of $2,586.31.  See debtors Schedule C attached as Exhibit D.

6.  The amount of movant's debt as of June 18, 2018 is approximately $160,840.99. The property is subject to a first mortgage in favor of U..S. Bank National Association and/or Mr. Cooper dba Nationstar Mortgage LLC in the original principal amount of $160,000.  The debt owed to U.S. Bank as of July 19, 2018 was $57,016.22, plus fees and costs.  The debt owed o the first and second mortgages total, approximately $217,856.00.

7. The costs of selling the property through a realtor with a customary 6% commission at a selling price of $220,000 is $13,680.00.

8. No payments of principal and interest are being made to Movant by the debtor, and the Movant lacks adequate protection. The debtors are contractually due for the November 4, 2017 payment .

9. The equity analysis under Section 362 (d) (2) is summarized as follows:

| | | |
|---|---|---|
| a. | Value of Property | $228,000.00 |
| b. | Less Movant's Judgment Debt | $160,840.99 |
| c. | Less Movant's First Mortgage Debt as of July 17, 2018 | $ 57,016.22 |
| c. | Less Costs of Sale | $ 13,680.00 |
| | Less-Debtor's Exemption | $ 2,586.31 |
| | Net Equity for Estate | $ (6,123.52) |

10. The Movant requests relief from the stay imposed by Section 362 of the Bankruptcy Code to permit it to continue with its foreclosure action in the Litchfield Superior Court bearing Docket No. LLI-CV-18-6018239S.

WHEREFORE, the Movant prays upon final hearing of this Motion that the stay be terminated to allow the Movant to commence with a foreclosure action on the real property known as 62 Qual Run, Torrington, Connecticut, and to obtain possession of said premises.

Dated at Avon, Connecticut this 31st day of August, 2018.

MOVANT

By:___/s/ Robert J. Piscitelli
Robert J. Piscitelli ct 08876
Law Offices of Robert J. Piscitelli, LLC
56 East Main Street, Suite 1
P.O. Box 805
Avon, CT 06001-0805
(860) 677-6655
rpiscitelli@rjplawoffice.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In Re: | : | Case No. 18-50955 |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | Chapter 7 |
| Debtor | : | |
| VS | : | |
| | : | |
| PEOPLE'S UNITED BANK, N.A. | : | August 31, 2018 |
| Movant | : | |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | |
| RICAHRD M. COAN | : | |
| Respondents | | |

## NOTICE OF CONTESTED MATTER RESPONSE DATE

People's United Bank, N.A., (the "Movant")  has filed the following documents, a copy of which are attached hereto:

(1)     Motion for Relief from Stay (the "contested Matter") and
(2)     a proposed order;

with the U.S. Bankruptcy Court.  Notice is hereby given that any response to the Contested Matter must be filed with the Court no later than September 14, 2018,  in accordance with Federal Rules of Bankruptcy Procedure 2002 (a) and 9014.  In the absence of a timely filed response, the proposed order in the Contested Matter **may** enter without further notice and hearing, see, 11 U.S.C. section 102(1).
**Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

Date:  8/31/18                              THE MOVANT,
                                    By:     /s/ Robert J. Piscitelli
                                      Robert J. Piscitelli ct 08876
                                      Meyers, Piscitelli & Link LLP
                                      56 East Main Street, Suite 1
                                      P.O. Box 805
                                      Avon, CT  06001-0805
                                      (860) 677-6655
                                      rpiscitelli@mpllawfirm.com

*Pursuant to Federal Rule of Bankruptcy Procedure 9006(f), if service is made by mail, three days are added after the response date set in this notice.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In Re: | : | Case No. 18-50955 |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | Chapter 7 |
|     Debtor | : | |
| VS | : | |
| | : | |
| PEOPLE'S UNITED BANK, N.A. | : | August 31, 2018 |
|     Movant | : | |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | |
| RICAHRD M. COAN | : | |
|     Respondents | : | |

## <u>ORDER GRANTING RELIEF FROM STAY</u>

People's United Bank, National Association  (hereafter the "Movant") filed a

<u>Motion for Relief from Stay</u>, (hereafter, the "Motion"), Doc. I.D. No. ___.  After notice and

a hearing, see 11 U.S.C. § 102(1), and in compliance with the Court's Bar Date Procedure,

and it appearing that the relief sought in the Motion should be granted, it is hereby

**ORDERED** that the automatic stay provided in 11 U.S.C. § Section 362(a) is

modified pursuant to 11 U.S.C. § [362(d)(1)/362(d)(2)] to permit the Movant, and/or its

successors and assignees, exercise their rights, if any, with respect to real property known as

62 Quail Run, Torrington, Connecticut 06790 in accordance with applicable non-bankruptcy

law.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In Re: | : | Case No. 18-50955 |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | Chapter 7 |
|    Debtor | : | |
| VS | : | |
| | : | |
| PEOPLE'S UNITED BANK, N.A. | : | August 31, 2018 |
|    Movant | : | |
| | : | |
| | : | |
| JOSEPH C. NADER | : | |
| RANDI S. NADER | : | |
| RICAHRD M. COAN | : | |
|    Respondents | : | |

## CERTIFICATE OF SERVICE

In accordance with the applicable provisions of the Federal Rules of Bankruptcy Procedure, 2002 and 7004, the undersigned certifies that on the 31st day of August, 2018, the following documents were served on the U.S. Trustee and all appearing parties via the court's electronic filing system or, by first class mail on the parties listed in section 2 below.

1.    **Documents Served**:
1.    Motion for Relief from Stay
2.    Proposed Order
3.    Notice of Contested Matter

2.    **Parties Servied Via First Class Mail:**
1.    Joseph C. Nader
      Randi S. Nader
      62 Quail Run
      Torrington, CT 06790

By:    /s/ Robert J. Piscitelli
       Robert J. Piscitelli ct 08876
       Law Offices of Robert J. Piscitelli, LLC
       56 East Main Street, Suite 1
       P.O. Box 805
       Avon, CT  06001-0805
       (860) 674-2771
       rpiscitelli@rjplawoffice.com

DATE OF AGREEMENT: June 28, 2006

## *people's bank*

**PEOPLE'S EQUITY CREDIT LINE
SCHEDULE OF TERMS**

4.28

**BORROWER(S):** JOSEPH C NADER
RANDI NADER

**PROPERTY ADDRESS:** 62 QUAIL RUN, TORRINGTON, CT 06790

**SCHEDULE OF TERMS:** This Schedule of Terms is part of your People's Bank Equity Credit Line (PECL) Note, Agreement and Disclosure Statement (the "Agreement"). It contains important terms of your PECL. Please review it carefully before you sign it. All capitalized words and phrases in this Schedule of Terms are defined in the Agreement.

**LOAN DESCRIPTION:** The maximum time that you can obtain Loan Advances is 9 ½ years. This is the **"Credit Line Phase"**. After 9 ½ years, your balance will be repayable over up to 20 years in up to 240 equal monthly principal payments, plus interest. This is the **"Repayment Phase"**.

The Loan must be fully paid by December 25, 2035, which is called the **"Final Payment Date"** in the Agreement.

**YOUR CREDIT LINE is:** ........................................................ $ 170,000.00

**YOUR FUNDS WILL BE AVAILABLE after 12:00 noon on:** ..................... July 03, 2006

**INTEREST RATE:**

Your initial daily periodic rate is: ............................................. 0.01942%

This is an **ANNUAL PERCENTAGE RATE** of: ................................ 6.99%

The first day of each billing cycle is a "Change Date". The date on which your Annual Percentage Rate can change ("Change Date") for the first time is: ........................ July 11, 2006

Beginning with the first Change Date, your rate can change each month if the "Index" (the Prime Rate) or your Margin changes, but your interest rate can never be higher

than: ........................................................................ 17.00%

or lower than: ............................................................... 3.00%

**MARGIN:** The number of percentage points above (if shown with a "+") or below (if shown with a "-") the Index at which your interest rate will be set on each Change Date is called the "Margin".

The Margin that will be in effect on the first Change Date and on each Change Date thereafter until your PECL is paid in full will be: ........................................ -1.01

**CONDITIONS:** You will receive this Margin only if you maintain a People's Bank checking account throughout the term of the Line of Credit and if you instruct People's Bank to make an advance under the Line of Credit of at least $25,000 directly to a third party at closing. If you do not satisfy both of these conditions, your margin will increase by 0.25 of one percentage point.

---

Loan #: .......
Printed: 06/20/2006

## AUTHORIZATION FOR PAYOFF (if applicable)

DISBURSEMENT DATE:   July 03, 2006

You are required to pay off or pay down (as indicated) the accounts listed below using the loan proceeds.  For lines of credit, credit cards or similar loans that are listed below as being paid off, the lender will be advised to close the account so no more advances or loans will be allowed.  If the Payoff Amount is not enough to completely pay off the loan, People's may make an advance on your Equity Credit Line to pay any remaining balance.

People's will add additional interest to the Payoff Amount or Paydown Amount to allow for delivery time and as may otherwise be required by the creditor to pay off or pay down the account.  The Per Diem is the interest for one day.  The amount that People's will add will be equal to the Per Diem amount multiplied by the number of days until the creditor will receive the payment.  If the addition of a Per Diem amount is not applicable, a reason must be written in below.

If the below information is required and not completed in full, your loan will only be disbursed when all the information is received by People's at the branch office where the closing was conducted.

| CREDITOR'S NAME AND ADDRESS* | ACCOUNT NUMBER* | PAYOFF AMOUNT** OR PAYDOWN AMOUNT as of Disbursement Date | PER DIEM |
|---|---|---|---|
| 1.   PEOPLES BANK, 850 MAIN STREET, Bridgeport CT 06604 | | $~~122,294.22~~   $12,563.02 | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

*Addresses and account numbers are essential to accomplish the payment.  Addresses must be a street address, NOT a P.O. Box.
**Payoff Amounts must be as of the disbursement date.

## AGREEMENT

By signing this Schedule of Terms, you acknowledge that you understand the provisions of this authorization.  You authorize People's Bank to (i) activate your People's Equity Credit Line, (ii) submit the Payoff Amounts shown above plus the appropriate daily interest rate charges required by the creditor to pay off or pay down the account if indicated above, and (iii) CLOSE the accounts with the creditors, unless otherwise specified above.  The remaining balance on any accounts shown above is your responsibility to pay.  You agree not to hold People's responsible for any inaccuracy in the information above, including incorrect address, incorrect payoff amount, or incorrect Per Diem.  You also agree not to hold People's responsible for any mailing delay.

**FEES AND CHARGES**

| | | | |
|---|---|---|---|
| Recording Fee | $48.00 | Credit Report Fee | $.80 per applicant |
| | | Title Examination and Lien Protection Fee: | |
| Appraisal Fee (as applicable) | | - Credit Lines up to $250,000 | $75.00 |
| - Limited | $200.00 | - Credit Lines over $250,000 and up to $500,000 | $120.00 |
| - Full | $400.00 | | |
| - AVM (Automated Valuation Model) | $10.00 | | |

The fees listed above are waived in recognition of your being a valued People's customer.

**TOTAL CHARGE TO CUSTOMER**  $0

**Prepayment Fee:**  If you close your account within one year after the date of the Note, you must pay a prepayment fee of $500.  If you close your account after one year, but less than two years after the date of the Note, you must pay a prepayment fee of $250.  After two years there is no prepayment fee.

**Late Charge:**

- Credit Line Phase    5% of the finance charge due or $29.00, whichever is greater.

- Repayment Phase    5% of the finance charge and principal due or $29.00, whichever is greater.

Your payment will be late if it is not received by People's within 25 days after the closing date of a billing cycle.

| | | | |
|---|---|---|---|
| **Return Check Fee:** | $29.00 | **Copy Fees:** | |
| **Annual Fee:** | | - Per page | $2.00 |
| - Credit Line Phase | $50.00 per year | - Per hour of employee time | $20.00 |
| | This fee is waived in the first year only for People's Advantage PLUS™ and People's Advantage PLUS Premier™ Checking customers. | | |
| - Repayment Phase | $0.00 | | |

**Over Limit Fee:**    $20.00 for each Loan Advance over your Credit Line.

By signing below, you, the borrower, state that you have received a completed copy of this Schedule of Terms, including the Authorization for Payoff, and the Note, Agreement and Disclosure Statement.  You agree to all of the terms in those documents.  You also certify to People's that the information that you have given to People's on your loan application is true and complete.  You understand and agree that a Loan Advance may be made to or at the request of any one of the borrowers named below and that an Equity Credit Line Check will be valid if it is signed by only one borrower.

You authorize People's to provide credit information about you to any credit reporting service and you authorize People's to respond to credit inquiries.  You also agree that People's may obtain new or updated consumer reports (credit reports) about you in connection with your Equity Credit Line, including any update, renewal, or extension.

**Dated:** June 28, 2006

Borrower:    JOSEPH C NADER

Borrower:    RANDI NADER

Thank you for giving us the opportunity to be of service to you.  If you have any questions or concerns regarding your account, please contact our Loan Customer Service Representatives, Monday through Friday 9:00am to 5:00pm, or our 24-hour touch-tone service at (203) 338-3678 or (800) 525-1006.

# *people's bank*

**PEOPLE'S EQUITY CREDIT LINE NOTE, AGREEMENT AND DISCLOSURE STATEMENT**

***TAX DEDUCTIBILITY. You should consult a tax advisor regarding the deductibility of interest and charges on People's Equity Credit Line.***

*You and People's agree to all the terms that follow:*

*1.   **DEFINITIONS.** a) The words "you" and "your" mean the borrower(s) who sign this Agreement. b) The words "People's," "we," "us," and "our" mean People's Bank, 850 Main Street, Bridgeport, Connecticut 06604, the creditor in this Agreement. c) The word "Account" means the record kept by People's of transactions made under this Agreement, including Loan Advances, Finance Charges by People's, and payments you make. d) The word "Agreement" means this People's Equity Credit Line Note, Agreement and Disclosure Statement and the People's Equity Credit Line Schedule of Terms (the "Schedule of Terms"). e) The words "billing cycle" mean the time period covered by your People's Equity Credit Line statement which is approximately one month. f) The words "Credit Line" mean the maximum amount of credit that People's has agreed to lend to you that can be outstanding at any time. The amount of your Credit Line is stated on your Schedule of Terms. g) The phrase "Entire Loan Balance" means all unpaid Loan Advances, finance charges, late charges and all other costs, fees and charges which you have promised to pay People's in this Agreement or in the Mortgage securing this Agreement. h) The words "Equity Credit Line" refer to the name of the Account established for you by People's under this Agreement. i) The word "Home" means the buildings, improvements and real property mortgaged to People's to secure the Entire Loan Balance. j) The word "Index" means the highest United States prime rate which is published in the eastern edition of The Wall Street Journal. k) The words "Line in Use" mean the sum of (i) all Loan Advances plus (ii) all unpaid Finance Charges. l) The words "Loan Advance" mean a loan provided by People's to you under Section 3.B. and Section 8.G. of this Agreement. m) The word "Mortgage" means the mortgage, mortgage deed or other security instrument that you sign to give People's a security interest in your Home to secure your promise to pay the Entire Loan Balance to People's and to secure your other obligations to People's in this Agreement.*

*2.   **YOUR RESPONSIBILITY.** Anyone who signs this Agreement is responsible to pay the entire amount owed to People's under this Agreement or the Mortgage securing this Agreement.*

*3.   **HOW YOUR EQUITY CREDIT LINE ACCOUNT WORKS.***

   ***A. Credit Line.*** *Your Line in Use may not exceed your Credit Line. People's may refuse to honor any request you make for a Loan Advance which would cause your Line in Use to exceed your Credit Line.*

   ***B. Loan Advances.*** *You can begin to borrow money under this Agreement by taking a Loan Advance beginning on the fourth (4th) business day after you sign this Agreement. People's may waive this waiting period if you sign this Agreement on the same day you buy your Home. You may repay all or part of your Loan Advances at any time. See Section 7. You can borrow money under this Agreement, and thus get Loan Advances under your Equity Credit Line in any of the following ways (provided you do not exceed your Credit Line):*

   *1.   You write an Equity Credit Line Check. People's will give you special checks, called "Equity Credit Line Checks," for you to use only with your Equity Credit Line. Even if more than one person is signing this agreement only one signature is required on an Equity Credit Line check. You may not print your own Credit Line Checks. People's may refuse to honor checks other than Equity Credit Line Checks it has provided to you. If it discovers a non-Equity Credit Line Check has been processed, it reserves the right to demand immediate repayment of any amount advanced under a Loan Advance made by the use of such unauthorized check.*

   *2.   You call in a Telephone Banking authorization, but only if you establish an account at People's with Telephone Banking services. A Telephone Banking authorization can be made by calling our Call Center and authorizing a Loan Advance to be credited to your People's Plus Checking Account. Loan Advances using Telephone Banking will be permitted only if the People's Plus Checking Account into which the Loan Advance is to be credited is in the same name(s) as your Equity Credit Line.*

   *3.   Any one of you completes a counter check at any People's branch office authorizing a Loan Advance.*

APPID:

PECLAD01 (Rev. 04/05/2006)

C. **Minimum Loan Advance Amount.** *The minimum amount of any  Loan Advance is $500. People's will make Loan Advances to you so long as each Loan Advance is for at least $500 and the amount of the new Loan Advance, when added to your Line in Use, is not more than your Credit Line. For purposes of Sections 3.A., 3.B., and 3.C., your Line in Use includes payments which you have made by check and which have not yet cleared.*

D. **Term of Agreement.**

1. *Credit Line Phase.* You may obtain Loan Advances on your Credit Line for nine and one-half (9 1/2) years (the "Credit Line Phase"). Unless sooner terminated or reduced as provided in this Agreement, your right to obtain Loan Advances terminates, and People's will not make any more Loan Advances to you, nine and one-half (9 1/2) years after the scheduled due date of your first monthly payment during the Credit Line Phase (the "Credit Line Termination Date"). People's may demand early repayment of your Entire Loan Balance if you are in default as provided in Section 10 of this Agreement. People's may temporarily reduce or terminate your Credit Line if any of the events listed in Section 15.B. of this Agreement occurs.

2. *Repayment Phase.* On the Credit Line Termination Date, the amount of your Line in Use becomes repayable over a period of up to twenty (20) years (the "Repayment Phase").

E. **Repayment.** *You agree to make a minimum payment each month during the Credit Line Phase and during the Repayment Phase. People's will send you a statement after the end of each billing cycle in which there is any finance charge or other activity in your account. The minimum payment shown on the statement is due within 15 days after the end of the billing cycle. You are allowed a "Grace Period" after a payment is due, which is stated in your Schedule of Terms. If you do not make the payment within the Grace Period, you must pay the late charge shown on your Schedule of Terms.*

1. *Credit Line Phase.* During the Credit Line Phase, your minimum monthly payment is the finance charge (interest) imposed during the billing cycle covered by the statement, plus any annual fee, late charge, over-limit fees, or other fees which become payable during the billing cycle, plus any amounts past due. During the Credit Line Phase, if you make only the minimum payments, you will not repay any of the principal of the Loan Advances which have been made to you.

2. *Repayment Phase.* You must repay the amount of your Line in Use (called "Principal") during the Repayment Phase in equal monthly principal payments. Your minimum monthly principal payments will be equal to the greater of $25 or the amount of your Line in Use at the end of the Credit Line Phase divided by 240. The first monthly principal payment shall be payable during the month following the Credit Line Termination Date. Your monthly principal payments shall continue on the same day of each month, until the principal is fully paid. Commencing on the same day that the first monthly principal payment is due and continuing on the same day of each month until the principal is fully paid, you must also pay a finance charge on the unpaid principal for the billing cycle covered by the statement. You must also pay any fees and charges which became payable during the billing cycle, plus any unpaid principal, finance charges, and fees and charges previously billed to you. Your minimum monthly payment during the Repayment Phase is the amount described in this section 3.E.2.

3. *Over Limit Advances.* If we make a Loan Advance that exceeds your Credit Line, or if your Line in Use exceeds your Credit Line for any other reason, you must pay the excess to us immediately upon demand. Your monthy billing statement payment due will include any Loan Advance or other amounts that cause your Line in Use to exceed your Credit Line.

4. *Payments Using PECL Advances Prohibited.* You may not make your minimum payment using a PECL check or any other Loan Advance. Your obligation to make minimum payments without using a Loan Advance is a "material obligation" as that phrase is used in Section 15.B.3 of this Agreement. In addition, to the extent allowed by law, we will treat making a minimum payment with a Loan Advance as a failure to make a payment under Section 10.B.

4. **ADJUSTABLE ANNUAL PERCENTAGE RATE.**

A. **Initial Rate.** *The initial daily periodic rate and annual percentage rate are stated on the Schedule of Terms.*

B. **360-Day Year.** *People's uses the 360-day year, 30-day month system to figure your finance charge. Therefore, the daily periodic rate is equal to the annual percentage rate divided by 360. The annual percentage rate includes only interest and no other costs.*

C. **Your Rate May Change.** *People's may change your annual percentage rate on the first day of each billing cycle if the Index has increased or decreased or if there is any other change in circumstances that changes your margin, as described on the Schedule of Terms. People's may not change your annual percentage rate more frequently than once a month during the term of this Agreement. An increase in the annual percentage rate will result in higher monthly minimum payments. The maximum amount that People's can change your rate is stated on the Schedule of Terms.*

D. **Your Rate During this Agreement.** *The annual percentage rate for each billing cycle will be equal to the Index on the last day that The Wall Street Journal is published before the start of the billing cycle, plus the Margin stated on the Schedule of Terms.*

PECLAD02 (Rev. 04/05/2008)                                                                                          APPI

5.  **FINANCE CHARGE.**

**How People's Figures the Monthly Finance Charge.** *The finance charge that you must pay as described in Section 3.E. begins when People's makes a Loan Advance to you, which is the date when 1) People's pays an Equity Credit Line Check ; 2) you call Telephone Banking to authorize a Loan Advance (if you call after 4:00 p.m., the Loan Advance may be made on the following business day); or 3) People's pays a counter check you sign.*

*There will be no time period during which you may repay a Loan Advance without incurring a finance charge, unless you repay the Loan Advance on the same day that it is made. People's figures the finance charge on your Equity Credit Line Account each day by applying the annual percentage rate as a daily periodic rate to the "daily balance" of your Account, including current transactions. To get the "daily balance," People's takes the beginning balance of your Account each day, adds any new Loan Advances and charges, and subtracts any new payments, credits, and all unpaid finance charges or other charges. Each daily balance during the billing cycle is multiplied by the daily periodic rate which is in effect that day. This is the finance charge for each daily balance. All of the finance charges for each daily balance are added together to determine the finance charge for the billing cycle. Thirty days of finance charges are imposed in each month of the year, so no finance charge is imposed for the 31st day of any month and, for billing cycles that include February 28, extra days are added based on the daily balance on the last day of February so there are 30 days in the billing cycle.*

6.  **APPLICATION OF PAYMENTS**

   A.  **Credit Line Phase.** *Payments you make during the Credit Line Phase will be applied first to fully pay unpaid finance charges, second to fully pay unpaid annual fees, late charges and over limit fees in the order that People's may from time to time in its discretion determine, and third, to pay unpaid Loan Advances.*

   B.  **Repayment Phase.** *Payments you make during the Repayment Phase will be applied first to fully pay unpaid finance charges, second to fully pay monthly principal payments which are due or past due, third to fully pay any monthly credit life insurance payments which are due or past due, fourth to fully pay unpaid fees and charges imposed under Section 8 in such order as People's may from time to time in its discretion determine, and, fifth to pay unpaid principal not yet due. Any amount applied to pay unpaid principal not yet due will be applied to pay the last principal payments you owe at the end of the Repayment Phase.*

7.  **RIGHT TO REPAY.** *You may at any time repay all or part of your unpaid Line in Use. However, if you close your Account within the time period stated in the Schedule of Terms, you must pay a prepayment or termination fee if shown on the Schedule of Terms.*

8.  **FEES AND CHARGES.**

   A.  **Late Charge.** *If your required minimum monthly payment is received after the Grace Period, People's will charge you a late charge in the amount stated in the Schedule of Terms.*

   B.  **Annual Fee.** *You agree to pay a non-refundable annual fee in the amount stated in the Schedule of Terms. You agree to pay this fee whether or not you use your Account at any time during the year. Your first annual fee will be imposed the day your People's Equity Credit Line is established and will be payable during your first billing cycle. Later annual fees will be imposed each year on the anniversary of the establishment of your People's Equity Credit Line. No annual fees will be due during the Repayment Phase.*

   C.  **Returned Check Fee.** *If your payment check is returned to People's unpaid for any reason, you agree to pay a Returned Check Fee in the Amount stated on the Schedule of Terms for each returned check.*

   D.  **Over Limit Fee.** *Each time you use an Equity Credit Line Check or otherwise attempt to obtain a Loan Advance which would cause your Line in Use to exceed your Credit Line by any amount, you agree to pay an Overlimit Fee in the amount stated on the Schedule of Terms whether or not People's honors your Equity Credit Line Check or your attempt to obtain a Loan Advance.*

   E.  **Stop Payment Fee.** *If People's decides, in its sole discretion, to allow you to stop payment on Equity Credit Line Checks, you must pay a Stop Payment Fee for each Equity Credit Line check on which you stop payment. People's will send you a notice of the amount of the Stop Payment Fee if People's decides to allow you to stop payment on Equity Credit Line Checks.*

   F.  **Copy Fee.** *You agree to pay a copy fee in the amount stated on the Schedule of Terms for each page of photocopy of any record of your Account that you request plus a fee in the amount stated on the Schedule of Terms for the time it takes People's employee(s) to make the copies. You will not have to pay any copy fees, however, if the records reveal a billing error in your Account, as defined by the Federal Reserve Board's Regulation Z.*

PECLAD03 (Rev. 04/05/2006)                                                                                                          AP'

**G.  Payment of Fees and Charges.**

1. *During the Credit Line Phase, Annual Fees, Late Charges and Over Limit Fees will be added to your minimum payment due for the billing cycle during which the fee or charge becomes payable. Return Check Fees, Stop Payment Fees and Copy Charges will be added to your account as a Loan Advance when the Fee or charge becomes payable.*

2. *During the Repayment Phase. All fees and charges will be added to your minimum payment for the billing cycle in which the fee or charge becomes payable.*

9.     **YOUR STATEMENT.**  *People's will send you a statement of your Account for each billing cycle that your Line in Use is not zero or if a finance charge is imposed for the month. This will show your Line in Use, how much of your Credit Line is still available, and other important information, including the minimum payment that you must make.*

10.    **PEOPLE'S RIGHT TO DEMAND REPAYMENT OF YOUR CREDIT LINE.**  *People's may demand repayment of your Entire Loan Balance if any of the following events happens. These events are called "defaults". If you are in default, People's may terminate your right to obtain Loan Advances immediately without any prior notice to you and require you to pay immediately your Entire Loan Balance.*

   **A.    Fraud or Misrepresentation.**  *You or any person who signs the mortgage on your Home (the "Mortgage") have committed fraud or have made a material misrepresentation in connection with your account.*

   **B.    Failure to Make a Payment.**  *You fail to make any payment required by this Agreement within the time allowed.*

   **C.    Action You Take Which Adversely Affects Your Home.**  *Any action or inaction by you or by anyone else who signs the Mortgage adversely affects your Home or People's rights in your Home. For example, you could be in default if you do not maintain insurance on your Home or you do not pay your real estate taxes on your Home.*

11.    **PEOPLE'S SECURITY INTEREST**

   **A.    Mortgage on Your Home.**  *All Loan Advances and all other amounts owed to us under this Agreement are secured by the Mortgage, except that any principal that you owe that exceeds the principal amount of the Mortgage may not be secured by the Mortgage. This means that if you don't pay what you owe under this Agreement, People's can exercise its rights under the Mortgage to use your Home to pay what you owe. You have represented to us in order to get your People's Equity Credit Line that you live in your Home. You and People's agree that your occupancy of your Home is a "material obligation" as that phrase is used in Section 15.B.3 of this Agreement. This means that if all of you move out of your Home, People's may terminate or reduce your Credit Line as described in Section 15. The Mortgage contains various provisions concerning your obligation to maintain and insure your Home and describes how and under what conditions you may be required to pay at once in full all amounts that you owe People's under this Agreement. You agree that if People's receives a notice to stop making Loan Advances by one of you or by any other person who claims an interest in your Home, People's may stop making Loan Advances until the adverse claim is resolved to People's satisfaction. If one of you has given the notice, People's will not begin making Loan Advances until all of you give written notice to People's to do so.*

   **B.    Right of Set Off.**  *We also have the right, if you are in default, to take money from deposit accounts you have with us to pay your Line in Use even though your deposit account(s) may be held jointly in your name with one or more persons who are not obligated under this Agreement.*

12.    **PROPERTY INSURANCE**

*You agree to insure all buildings or any other improvements which are part of your Home in the amounts People's requires. People's will also require you to obtain flood insurance if your Home is in an area designated as a special flood hazard area. People's will not require insurance which exceeds the replacement value of the buildings and improvements which are part of your Home. The insurance coverage must include fire and other hazards included within the term "extended coverage" and must name People's as a loss payee and holder of a mortgage on your Home. You must obtain this insurance from an insurance company of your choice which is licensed to sell insurance in the state where your Home is located. If you fail to maintain the required insurance, People's may buy and maintain the insurance, but that insurance may only insure People's interest in your Home and not your own interest. You agree to pay to People's any costs People's pays to insure your Home. People's may charge these insurance costs to your Account as a Loan Advance.*

PECLAD04 (Rev. 04/05/2006)                                                                  APPID

13. **COLLECTION COSTS.** *In the event of a default, People's may turn over your debt to a collection agency or an attorney for collection. If so, you agree to pay the costs of collection, including reasonable attorney's fees, to the maximum extent allowed by law. These fees may also include court costs, the cost of getting a new appraisal of your Home, the cost of a title search, and other out of pocket expenses. You also agree to pay any costs, including reasonable attorney's fee, incurred by People's in protecting its Mortgage or in protecting its interest in your Home.*

14. **FINANCIAL INFORMATION.** *People's may update periodically the financial information provided by you. You agree to provide People's with any financial information which People's may reasonably request in updating your financial information. People's will also have the right to get new consumer reports (credit reports) about you without further notice in connection with an update of its information about you. You and People's agree that your obligation to provide updated financial information is a material obligation within the meaning of Section 15.B.3.*

15. **TERMINATION OR REDUCTION OF CREDIT LINE.**

    A. **Definition of Termination and Reduction.** *A "reduction" of your Credit Line means that People's or you have lowered the Credit Line stated in your Schedule of Terms to an amount other than zero. If the Line in Use is less that the Credit Line as so reduced, you may obtain further Loan Advances, but not in excess of the Credit Line as so reduced. If your Credit Line is "terminated," the Credit Line stated in your Schedule of Terms becomes zero and you may not obtain further Loan Advances under this Agreement. Termination of your Credit Line prohibits any additional extensions of credit to you but does not make your Line in Use due and payable.*

    B. **People's Right to Terminate or Reduce Your Credit Line.** *People's may temporarily terminate or reduce your Credit Line, without prior notice to you, if any of the following events occurs:*

        1. *The value of your Home declines significantly below the value at which it was appraised when you applied for your Equity Credit Line.*
        2. *People's reasonably believes you will not be able to meet the repayment requirements of this Agreement due to a material change in your financial circumstances.*
        3. *You are in default of any material obligation set forth in this Agreement.*
        4. *Government action prevents People's from charging the annual percentage rate provided in this Agreement or impairs our security interest in your Home to the extent that the value of the security interest is less than 120% of the Credit Line.*
        5. *A regulatory agency has notified People's that continued advances would constitute an unsafe and unsound practice.*
        6. *The maximum annual percentage rate is reached, as shown on your Schedule of Terms.*
        7. *A default exists as defined in Section 10.*

    *People's will give you notice of the termination or reduction after it is effective. The termination or reduction of your Credit Line will remain in effect until you ask us to reinstate it and we can confirm that the event that gave us the right to terminate or reduce your Credit Line no longer exists. We have the right to charge you the cost of a new credit report or appraisal at that time if appropriate to confirm that the event no longer exists.*

    C. **Your Right to Terminate or Reduce your Credit Line.** *At any time you (any one of you if more than one person signed this Agreement) may terminate or reduce your Credit Line. However, People's reserves the right not to reduce your Credit Line below the minimum credit line which People's is offering for new equity credit lines. Your instruction to terminate or reduce your Credit Line must be in writing and will not be effective until People's Consumer Loan Department receives it and has had a reasonable opportunity to act on it. To reinstate your Credit Line to the amount stated in the Schedule of Terms, you (all of you if more than one person signed this Agreement) and People's must agree in writing. People's may in its discretion refuse to reinstate your Credit Line. You will have to pay a termination fee or prepayment fee if you close your Account within the time period for payment of that fee as stated in the Schedule of Terms.*

    D. **Your Right to Cut Short the Credit Line Phase and Begin the Repayment Phase.** *Commencing one (1) year after the date of this Agreement, you (all of you if more than one person signed this Agreement) may terminate the Credit Line Phase and start the Repayment Phase as described in Section 3.D.2. Your instruction to do so must be in writing signed by all of you and may not later be reversed.*

16. **CHANGING THE TERMS OF THIS AGREEMENT.** *People's may amend the terms of this Agreement as follows:*

    **A.** *People's may change the Index and Margin if the original Index is no longer available.*

    **B.** *People's may make any change to this Agreement to which you agree in writing.*

    **C.** *People's may make any change to this Agreement which unequivocally benefits you.*

    **D.** *People's may make any change to this Agreement which is insignificant.*

    **E.** *Where this Agreement provides that a specified change to the terms will occur if a specific event takes place, People's may change the terms if the event takes place.*

    *If People's changes the terms, People's will mail notice of the change to your last known address, if notice is required by law.*

17. **DELAY OR WAIVER IN ENFORCEMENT.** *People's can delay enforcing any of People's rights under this Agreement without losing them. People's can waive any right it has under this Agreement without losing its ability to enforce that righ at a later time. People's may terminate or reduce your Credit Line under Section 15.B.7. and later demand payment in full under Section 10. if the default still exists.*

18. **STOP PAYMENT.** *You may not stop payment on Equity Credit Line Checks that you have written.*

19. **WHO HAS RIGHTS AND DUTIES.** *You cannot turn over ("assign") to anyone else your right to use the Credit Line. If you die or become incapable of managing your affairs, your duties under this Agreement extend to your conservator, heirs, executors and administrators.*

20. **SEVERABILITY.** *A finding that any part of this Agreement is invalid, illegal or unenforceable in any respect shall not affect or impair the validity, legality or enforceability of those other provisions of this Agreement which can be given effect.*

21. **BILLING ERRORS.** *A statement of your right to dispute billing errors appears below.*

### Your Billing Rights

### Keep This Notice for Future Use

*This notice contains important information about your rights and People's responsibilities under the Fair Credit Billing Act.*

### Notify Us in Case of Errors or Questions About Your Account Statement

*If you think your Account Statement is wrong, or if you need more information about a transaction on your Account Statement, write People's on a separate sheet of paper at People's Consumer Loan Department, Customer Service, P.O. Box 9078, Bridgeport, Connecticut 06601. Write to People's as soon as possible. People's must hear from you no later than 60 days after People's sent you the first Account Statement on which the error or problem appeared. You can telephone People's but doing so will not preserve your rights. In your letter, give People's the following information:*

· *Your name and account number.*
· *The dollar amount of the suspected error.*

· *Describe the error and explain, if you can why you believe there is an error. If you need more information, describe the item you are not sure about.*

*If you have authorized People's to pay your Equity Credit Line bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach People's three business days before the automatic payment is scheduled to occur.*

### Your Rights and the Bank's Responsibilities After People's Receives Your Written Notice.

*People's must acknowledge your letter within 30 days, unless People's has corrected the error by then. Within 90 days, People's must either correct the error or explain why People's believes the Account Statement was correct.*

*After People's receives your letter, People's cannot try to collect any amount you question, or report you as delinquent. People's can continue to bill you for the amount you question, including finance charges, and People's can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while People's is investigating, but you are still obligated to pay the parts of the Account Statement that are not in question.*

*If People's finds that People's made a mistake on your Account Statement, you will not have to pay any finance charges related to any questioned amount. If People's did not make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, People's will send you a statement of the amount you owe and the date that it is due.*

*If you fail to pay the amount that People's thinks you owe, People's may report you as delinquent. However, if People's explanation does not satisfy you and you write to People's within ten days telling People's that you still refuse to pay, People's must tell anyone People's reports you to that you have a question about your Account Statement.*

*And, People's must tell you the name of anyone to whom People's reported you. People's must tell anyone People's reports you to that the matter has been settled between you and People's when it finally is.*

*If People's does not follow these rules, People's cannot collect the first $50 of the questioned amount, even if your Account Statement was correct.*

22. **TRANSFER BY PEOPLE'S.** *People's has the right to transfer and assign this Agreement and the Mortgage to someone else. If People's does so, the new lender will have all of People's rights and obligations under this Agreement and the Mortgage.*

23. **GOVERNING LAW.** *This Agreement and the use of your Account shall be governed by and interpreted under Federal and Connecticut law, without reference to principles of conflict of laws. Federal law includes but is not limited to the laws, rules and regulations applicable to banks insured by the Federal Deposit Insurance Corporation. This Agreement is made, accepted and administered by People's in the State of Connecticut and decisions about granting credit to you and all Loan Advances extended by People's under this Agreement are made by People's in Connecticut. Federal and Connecticut law will also apply to all questions about the legality, enforceability and interpretation of this Agreement or your Account. If any part of this Agreement becomes invalid under applicable law, the remainder of this Agreement will remain valid and in effect.*

24. **SCHEDULE OF TERMS.** *The Schedule of Terms that you sign is part of this Agreement. It describes important terms of your Equity Credit Line. Please read it carefully before you sign below.*

25. **UNDERSTANDING. Your signature below indicates that you have read this Agreement, understand it, and agree to its terms.**

**QUESTIONS.** If you have any questions, please write to People's Bank, People's Consumer Loan Department, BC11 - 341, 850 Main Street, Bridgeport, Connecticut 06604 or call our Loan Customer Service Representatives, Monday through Friday 9:00 a.m. to 5:00 p.m., or our 24 hour touch-tone service at (203) 338-3678 OR 1 (800) 525-1006. A telephone inquiry will not preserve your rights under Federal law.

Dated: June 28, 2006

Primary Borrower: JOSEPH C NADER

Borrower: RANDI NADER

Borrower: _____

Borrower: _____

PECLAD07 (Rev. 04/05/2006)

APPID:

316510

**peoples bank**

VOL 0981 PAGE 0160 **OPEN END MORTGAGE DEED**

**Consumer Revolving Loan - Variable Interest Rate**

THIS MORTGAGE, (the "Mortgage") by JOSEPH NADER and RANDI S. NADER of the Town/City of TORRINGTON, County of LITCHFIELD and State of CT (hereinafter referred to as "Mortgagor" in the singular, and in the masculine gender, regardless of actual gender or number of actual Borrowers) given to PEOPLE'S BANK, a capital stock savings bank organized under the laws of the State of Connecticut, having its main office at 850 Main Street, Bridgeport, Connecticut 06604 (hereinafter referred to as "BANK"). To secure the indebtedness hereinafter cited, Mortgagor grants and conveys to the BANK the property located at 62 QUAIL RUN, TORRINGTON, CT 06790 more particularly described in, a deed recorded in Volume _____ Page _____ of the _____ Land Records, together with all improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, Mortgagor declares and agrees to be and remain a part of the property covered by this Mortgage. All of the foregoing, together with the property described above, are referred to in this Mortgage as the "Property." The Property is conveyed subject to: A MORTGAGE IN FAVOR OF BOA-MSP

TO HAVE AND TO HOLD such Property unto BANK, and its successors and assigns, forever. The Mortgagor, for himself and his heirs, executors, administrators, successors and assigns, also covenants with BANK, and its successors and assigns that at and until the execution and delivery of this Mortgage, he is the owner of the Property in fee simple and has good right, full power and lawful authority to bargain, sell, and convey the same in manner and form evidenced by this Mortgage, and that the Property is free from all encumbrances, except those listed above. Moreover, Mortgagor on behalf of himself and his heirs, executors, administrators, successors and assigns hereby warrants and agrees to defend the Property to and for BANK and its successors and assigns forever against all claims and demands except those listed above.

THE PURPOSE OF THIS MORTGAGE is to secure certain loan advances (hereinafter referred to as "Loans") made or to be made by the BANK, pursuant to a consumer revolving loan agreement entitled People's Equity Credit Line Note, Agreement and Disclosure Statement dated the same date as this Mortgage (hereinafter the "Note") to the persons signing the Agreement (hereinafter referred to as the "Borrower" in the singular and in the masculine gender regardless of actual gender or number of actual Borrowers) which Loans are intended to be used by the borrower primarily for personal, family or household purposes. The terms of the Agreement provide for the BANK to make Loans of money to the Borrower when so requested by the Borrower under the circumstances and subject to the limitations of this Agreement. All Loans made to the Borrower pursuant to the Agreement shall be secured by this Mortgage. The Loans secured by this Mortgage shall not at any time exceed the aggregate principal sum of $ 170,000.00 Dollars, with interest thereon. Unless sooner terminated as provided for in the Agreement, the Agreement provides that the Borrower has the right to obtain Loans under the Agreement during a nine and one-half (9-1/2) year period which terminates nine and one-half (9-1/2) years after the date of the Agreement (the "Credit Line Termination Date"). Commencing on the 25th day of the month following the Credit Line Termination Date, the unpaid balance of the Loans becomes payable in 240 consecutive equal monthly principal payments, with interest thereon. If not sooner paid or demanded, the entire loan balance matures and is due and payable without notice or demand on December 25, 2035.

MORTGAGOR also agrees to the following:

1. **CHARGES; LIENS.** Mortgagor will pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain priority over this Mortgage, as well as all leasehold payments or ground rents, if any, attributed to the Property, and Mortgagor will promptly furnish BANK with receipts of those payments. Mortgagor will promptly discharge any lien on the property other than the lien of any mortgage senior to this Mortgage that is identified above. Mortgagor will not be required to discharge immediately any lien identified above, so long as Mortgagor continues to pay or otherwise discharge the obligation secured by such lien in a manner acceptable to BANK.

2. **HAZARD INSURANCE.** Mortgagor will keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and any other hazards (including floods) that BANK may require and in the amounts and for the periods that BANK may require, but the BANK shall not require such insurance in an amount to exceed the replacement value of the Property with improvements thereon. Mortgagor may obtain the insurance from the insurance carrier of his choice, subject to BANK's approval, which approval will not be unreasonably withheld. Mortgagor will pay all premiums on insurance policies, when due, directly to the insurance carrier. All insurance policies and policy renewals shall be in a form acceptable to BANK and shall include a standard mortgage clause in favor of, and in a form acceptable to BANK. BANK shall have the right to hold the policies and policy renewals, and Mortgagor will promptly furnish BANK with all renewal notices and all receipts of premiums paid. In the event of loss, Mortgagor will notify the insurance carrier and BANK promptly. BANK may make proof of loss, if not made promptly by Mortgagor.

Unless BANK otherwise agrees with Mortgagor in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, provided that the restoration or repair is economically feasible and would not impair the security of this Mortgage. If restoration or repair is not economically feasible or if the security of this Mortgage would be impaired, the insurance proceeds shall be applied to the sums secured by this Mortgage with the excess, if any, paid to the Mortgagor. If Mortgagor abandons the Property, or if Mortgagor fails to respond to BANK within thirty (30) days from the date BANK mails a notice to Mortgagor that the insurance carrier offers to settle a claim for insurance benefits, Mortgagor authorizes BANK to collect and apply the insurance proceeds at BANK's option either to restoration or repair of the Property or to the sums secured by this Mortgage. Unless BANK otherwise agrees with Mortgagor in writing, any such application of proceeds to principal shall not extend or postpone the due date of any payment owing under this Mortgage or the Note secured by this Mortgage or change the amount of any such payments.

If BANK acquires the Property by foreclosure, deed in lieu of foreclosure or by any other method, all Mortgagor's right, title and interest in and to any insurance policies and in and to the proceeds of those policies resulting from damage to the property prior to BANK's acquisition shall pass to BANK to the extent of the sums secured by this Mortgage immediately prior to BANK's acquisition of the Property.

3. **PRESERVATION, MAINTENANCE OF PROPERTY; LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENT.** Mortgagor agrees that Mortgagor will keep the Property in good repair and will not commit waste or permit impairment or deterioration of the Property and will comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents. If a condominium or planned unit development rider is executed by Mortgagor and recorded together with this Mortgage, the covenants and agreements of that rider shall be incorporated into and shall amend and supplement this Mortgage as if the rider were a part hereof. Mortgagor shall take no action which might result in a material amendment to any of the documents governing the condominium or planned unit development or which would terminate professional management of the condominium or planned unit development.

4. **PROTECTION OF SECURITY.** If Mortgagor fails to perform any of the covenants or agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects BANK's interest in the Property, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, the BANK may, at its option, without notice to Mortgagor, make such appearances, disburse such sums and take such action as is necessary to protect BANK's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the property to make repairs. Mortgagor further agrees to reimburse BANK should BANK obtain title endorsements or similar guarantees to maintain BANK's lien priority on the Property.

Any amounts disbursed by BANK pursuant to this paragraph, with interest thereon, shall become additional indebtedness secured by this Mortgage. Unless BANK agrees with Mortgagor to other terms of payment, such amounts shall be payable upon notice from BANK to Mortgagor requesting payment thereof, and shall bear interest from the date of disbursement at the rate(s) payable from time to time on outstanding principal under the Note unless payment of interest at such rate(s) would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law. Nothing contained in this paragraph shall require BANK to incur any expense or take any action hereunder.

5. **INSPECTION.** BANK may make or cause to be made reasonable entries upon and inspections of the Property, provided that BANK shall give Mortgagor notice prior to any such inspection specifying reasonable cause therefor related to its interest in the Property.

6. **CONDEMNATION.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to BANK. In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage with the excess, if any, paid to Mortgagor. In the event of a partial taking of the Property, unless BANK has otherwise agreed with Mortgagor in writing, there shall be applied to the sums secured by this Mortgage such proportion of the condemnation proceeds as is equal to that proportion which the aggregate of the sums secured by this Mortgage immediately prior to the date of taking bears to the fairmarket value of the Property immediately prior to the case of taking, with the balance of the proceeds to Mortgagor. Unless BANK has otherwise agreed with Mortgagor in writing, any such application of proceeds to principal shall not extend or postpone the due date of any payment owing under this Mortgage or the Note secured by this Mortgage or change the amount of any such payments.

7. **FORBEARANCE NOT A WAIVER.** Any forbearance by BANK in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by BANK shall not be a waiver of its right to accelerate the maturity of the indebtedness secured by this Mortgage.

8. **REMEDIES CUMULATIVE.** All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage or afforded by law or equity, and may be exercised concurrently, independently, or successively.

9. **SUCCESSORS AND ASSIGNS BOUNDS; JOINT AND SEVERAL LIABILITY; CO-SIGNER; CAPTIONS.** The covenants and agreements contained in this Mortgage shall bind, and the rights hereunder shall inure to, Mortgagor's and BANK's respective heirs, executors, administrators, successors, and assigns, subject to the provisions of paragraph 14 and 15 hereof. All covenants and agreements of Mortgagor shall be joint and several. Any Mortgagor who co-signs this Mortgage, but is not a Borrower, (a) is co-signing this Mortgage only to mortgage, grant and convey that Mortgagor's interest in the Property to Bank under the terms of this Mortgage, (b) is not personally liable under the Note or under this Mortgage based his interest in the Property, and (c) agrees that Bank and any other Mortgagor or Borrower may agree to extend, modify, forebear, or make any other accommodations with regard to the terms of the Note or this Mortgage without that Mortgagor's consent and without releasing that Mortgagor or modifying this Mortgage as to that Mortgagor's interest in the Property. The captions and headings of the paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

ECLDED18 (Rev.12/09/05)

Page 1 of 2

Record and Return To:
Fiserv Lending Solutions
27 Inwood Road
ROCKY HILL, CT 06067


NADER, JOSEPH

ApplC
PECL - SPECIAL

F-591

VOL 0 PAGE 0166

10. **NOTICE.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Mortgagor provided for in this Mortgage shall be given by mailing the notice to Mortgagor at Mortgagor's address shown on the BANK's records or any other address Mortgagor may designate by notice to BANK as provided in this paragraph; and (b) any notice to BANK shall be mailed to BANK at its address stated herein or to such other address as BANK may designate by notice to Mortgagor as provided in this paragraph. Any notice provided for in this Mortgage shall be deemed to have been duly and properly given when given in the manner designated in this paragraph.

11. **GOVERNING LAW; SEVERABILITY.** This Mortgage shall be governed by and construed, interpreted, and enforced in accordance with the applicable laws of the State of Connecticut. All covenants, conditions and agreements herein shall run with the land, and shall be binding upon and inure to the benefit of the respective heirs, successors and assigns of the lender and the borrower. If any provision or clause of this Mortgage conflicts with applicable law, such conflict shall not affect the other provisions of this Mortgage which can be given effect without the conflicting provisions, and to this end the provisions of this Mortgage are severable.

12. **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; BANK IN POSSESSION.** As additional security hereunder, Mortgagor hereby assigns to BANK the rents of the Property, provided that Mortgagor shall, prior to an acceleration of the sums secured by this Mortgage or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon an acceleration of the sums secured by this Mortgage or abandonment of the Property, BANK shall, in person, by agent, or by judicially appointed receiver be entitled to enter upon, take possession of and manage the Property and to collect the rents from the Property, including those past due. All rents collected by BANK or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Mortgage. BANK and the receiver shall be liable to account only for those rents actually received.

13. **DEFAULT ON SENIOR MORTGAGE.** Mortgagor agrees to comply with all the terms and conditions of any Mortgage prior and Senior (hereafter "Senior Mortgage") to the lien of this Mortgage as listed above. If Mortgagor defaults under any such Senior Mortgage, the default shall constitute a default under this Mortgage and shall entitle BANK, at its option, to exercise any and all rights and remedies it has in the event of a default under this Mortgage. In the event of a default on any Senior Mortgage, BANK may, at its option, pay on Mortgagor's account any sums required to cure the default. Any sums advanced by Bank to cure the default shall be added to the outstanding balance of the Note and shall, to the extent permitted by law, be secured by this Mortgage.

14. **TRANSFER OF THE PROPERTY; ACCELERATION.** If Mortgagor sells or transfers all or any part of the Property or an interest therein without BANK's prior written consent, excluding only:
    (a)  the creation of a lien or encumbrance subordinate to this Mortgage;
    (b)  the creation of a purchase money security interest for household appliances;
    (c)  a transfer by devise, descent or by operation of law upon the death of joint tenant; or
    (d)  the grant of any leasehold interest of three (3) years or less not containing an option to purchase;
BANK may, at its option, and without notice, declare all the sums secured by this Mortgage to be immediately due and payable.

15. **ACCELERATION; REMEDIES.** All sums secured by this Mortgage shall immediately become due and payable, at BANK's option, without necessity for demand or notice if any of the following events happen: (a) any person signing the Note or this Mortgage has committed fraud or has made a material misrepresentation in connection with the Note or this Mortgage; (b) any payment required by the Note or this Mortgage is not made within the time allowed; (c) any person signing the Note or this Mortgage acts or fails to act in a way that adversely affects the Property or BANK's right in the Property. If BANK declares all sums secured by this Mortgage immediately due and payable, BANK may invoke any remedies permitted by applicable law.

16. **PAYMENTS AND PROCEEDS.** Unless applicable law provides otherwise, any payment made with respect to the Agreement and any amounts received by BANK under the terms of this Mortgage may, except as set forth in Paragraph 12 hereof, be applied by BANK first to unpaid finance charges and late charges.

17. **FUTURE ADVANCES.** The BANK hereby agrees, provided Mortgagor is not then in default under this Mortgage, and provided that Borrower is not in default under the Note, to make future advances of money to Borrower whenever so requested by Borrower, under the circumstances and subject to the limitations contained in the Note.

The covenants and agreements contained in this Mortgage, and the lien thereof, and in the Note shall continue and shall apply to all advances made by the BANK to the Borrower under the Note, notwithstanding the fact that the balance due BANK may from time to time be zero.

NOW THEREFORE, the Note shall be fully paid in accordance with its terms, and if all covenants and agreements contained in this Mortgage are performed, and if the Note shall be terminated as provided in this Mortgage duly executed by the BANK and recorded on the land records, this Mortgage shall be void; but otherwise, it is to remain in full force and effect.

IN WITNESS WHEREOF, Mortgagor has executed this Mortgage on June 28, 2006.

Signed, Sealed and Delivered in the Presence of:

Witness #1      _Diane Klos_

Witness #2      _Joanne Murgalo_

JOSEPH NADER

RANDI S. NADER

STATE OF CT
COUNTY OF NEW HAVEN        SS: WATERBURY

On this June 28, 2006, before me, _Joanne Murgalo_ the undersigned officer, personally appeared JOSEPH NADER and RANDI S. NADER known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that he/she/they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand.

Notary Public/Commissioner of the Superior Court
Date Commission Expires_____(seal)

My Commission Expires
Jan. 31, 2008

RECEIVED FOR RECORD

2006 AUG -9 AM 7: 37

BY Joan M. Laughlin

EGLDED2A (Rev. 12/09/05)

Please Return To:
People's Bank
CT Consumer Loan Servicing
850 Main Street
BC 11-344
Bridgeport, CT 06604

**Exterior-Only Inspection Residential Appraisal Report**      File # 3555900001

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address  62 Quail Run | City  Torrington | State  CT | Zip Code  06790 |
| Borrower  Nader | Owner of Public Record  Nader | | County  Litchfield |

Legal Description  Volume 486 Page 69

| | | | |
|---|---|---|---|
| Assessor's Parcel #  244/006/046 | | Tax Year  2017 | R.E. Taxes $  8,580 |
| Neighborhood Name  Eagle Ridge | | Map Reference  45860 | Census Tract  3106.01 |

Occupant  ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $  0    ☐ PUD  HOA $  0    ☐ per year ☐ per month

Property Rights Appraised  ☒ Fee Simple  ☐ Leasehold  ☐ Other (describe)

Assignment Type  ☐ Purchase Transaction  ☐ Refinance Transaction  ☒ Other (describe)  Workout

Lender/Client  People's United Bank, N.A.    Address  850 Main Street  Bridgeport CT 06604

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s).

DOM 184;Town Records & CTMLS - Subject was listed for sale on 05/17/2017 for $269,900. The listing expired on 11/17/2017 at $239,900.

☐ I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $            Date of Contract            Is the property seller the owner of public record?  ☐ Yes ☐ No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE    AGE | One-Unit  75 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | $(000)   (yrs) | 2-4 Unit  % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 50  Low  10 | Multi-Family  % |
| Neighborhood Boundaries | | | Commercial  20 % |
| The neighborhood is bounded on the North by: Town of Winchester; on the East by: Niles Road; on the South by: Route 202; on the West by: Route 183. | | 300  High  147 | Other  5 % |
| | | 250  Pred.  50 | |

Neighborhood Description

Subject is located in the northeastern quadrant of the Town of Torrington. Schools, local shopping, areas of employment, areas of recreation, highway access, and Town Offices are located within 0.50 to 5 miles of subject. Properties in subject's neighborhood indicate average to good appeal.

Market Conditions (including support for the above conclusions)

Inventories are being absorbed in most market segments as interest rates continue to be low. Marketing times are generally three to six months. Priced correctly, real estate sales contracts are indicating 96-100% of the asking price. Financing concessions are not typical and do not dominate the market; however, they are occasionally seen.

| | | | |
|---|---|---|---|
| Dimensions  See Attached Map | Area  19166 sf | Shape  Rectangular | View  N;Res; |

Specific Zoning Classification  R15    Zoning Description  Residence 15 = 15,000 sf Min.

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

See additional comment page.

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes ☐ No  If No, describe.

| Utilities | Public | Other (describe) | Public | Other (describe) | Off-site Improvements-Type | Public | Private |
|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water ☐ | ☒ Well | Street  Paved Asphalt | ☒ | |
| Gas | ☐ | None | Sanitary Sewer ☒ | ☐ Public | Alley  None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone  C    FEMA Map #  0950810000B    FEMA Map Date  04/04/1983

Are the utilities and off-site improvements typical for the market area?  ☒ Yes ☐ No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes ☒ No  If Yes, describe.

**Other = Vacant Land

Well is common to the area and are not considered adverse to marketability.

Source(s) Used for Physical Characteristics of Property  ☐ Appraisal Files  ☒ MLS  ☒ Assessment and Tax Records  ☐ Prior Inspection  ☐ Property Owner

☐ Other (describe)    Data Source for Gross Living Area  Town Records

| General Description | General Description | Heating / Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☐ Concrete Slab ☐ Crawl Space | ☐ FWA ☒ HWBB | ☒ Fireplace(s) #  1 | ☐ None |
| # of Stories  2 | ☒ Full Basement ☐ Finished | ☐ Radiant | ☐ Woodstove(s) #  0 | ☒ Driveway # of Cars  4 |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☐ Other | ☒ Patio/Deck  Wood | Driveway Surface  Asphalt |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls  Vinyl | Fuel Oil | ☒ Porch  Open | ☒ Garage # of Cars  2 |
| Design (Style)  Colonial | Roof Surface  Arch | ☐ Central Air Conditioning | ☒ Pool  Inground | ☐ Carport # of Cars  0 |
| Year Built  1990 | Gutters & Downspouts  Aluminum | ☐ Individual | ☒ Fence  Chain | ☐ Attached ☐ Detached |
| Effective Age (Yrs)  10 | Window Type  Double Hung | ☒ Other  None | ☐ Other  None | ☒ Built-in |

Appliances ☐ Refrigerator ☐ Range/Oven ☐ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☒ Other (describe)  Exterior inspection only

Finished area above grade contains:    9 Rooms    4 Bedrooms    2.1 Bath(s)    2,613 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).

None Noted.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.).

C3;This was a drive-by appraisal. Physical depreciation is unknown as this was a driveby appraisal only.  CTMLS had 36 photos and shows property to be in typical/average condition of age.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  ☐ Yes ☒ No

If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes ☐ No  If No, describe

Subject is typical of the style, condition, use, functional utility and construction quality within the neighborhood.

# Exterior-Only Inspection Residential Appraisal Report

File # 3555900001

There are   8   comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 209,900   to $ 299,900

There are   3   comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 234,900   to $ 285,000

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 62 Quail Run<br>Torrington, CT 06790 | 154 Hillandale Blvd<br>Torrington, CT 06790 | | 17 Warder Rd<br>Torrington, CT 06790 | | 59 Tall Tree Ln<br>Torrington, CT 06790 | |
| Proximity to Subject | | 0.42 miles E | | 0.29 miles W | | 0.40 miles NW | |
| Sale Price | $ | | $ 230,250 | | $ 230,000 | | $ 218,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 91.01 sq.ft. | | $ 78.05 sq.ft. | | $ 86.92 sq.ft. | |
| Data Source(s) | | CTMLS #170018033;DOM 74 | | CTMLS #170045876;DOM 78 | | CTMLS #G10233273;DOM 46 | |
| Verification Source(s) | | Tn. Rec. V. 1258 P. 333 | | Tn. Rec. V. 1264 P. 1086 | | Tn. Rec. V. 1253 P. 861 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing<br>Concessions | | Arm'Lth<br>Conv;0 | | Arm'Lth<br>Conv;0 | | Arm'Lth<br>Conv;0 | |
| Date of Sale/Time | | s12/17;c12/17 | | s05/18;c04/18 | | s08/17;c07/17 | |
| Location | B;Res; | B;Res; | | B;Res; | | B;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 19165 sf | 15246 sf | 0 | 26136 sf | 0 | 40511 sf | -2,500 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;Colonial | DT2;Colonial | | DT2;Colonial | | DT2;Colonial | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Actual Age | 28 | 16 | 0 | 13 | 0 | 26 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total \| Bdrms. \| Baths | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | |
| Room Count | 9 \| 4 \| 2.1 | 9 \| 4 \| 2.1 | 0 | 8 \| 4 \| 2.1 | 0 | 8 \| 4 \| 3.1 | -3,000 |
| Gross Living Area | 2,613 sq.ft. | 2,530 sq.ft. | +2,100 | 2,947 sq.ft. | -8,400 | 2,508 sq.ft. | +2,600 |
| Basement & Finished | 1308sf810sfwo | 1308sf0sfwu | +2,400 | 1265sf0sfwu | +2,400 | 872sf480sfwo | 0 |
| Rooms Below Grade | 1nr0br0.0ba0o | Average | 0 | Average | 0 | 1nr0br0.0ba0o | 0 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | HW/C/No CAC | HA/G/CAC | -5,000 | HA/G/CAC | -5,000 | HA/G/CAC | -5,000 |
| Energy Efficient Items | Standard Insl | Standard Insl | | Standard Insl | | Standard Insl | |
| Garage/Carport | 2gbi4dw | 2gbi4dw | | 3gbi4dw | -5,000 | 1gbi4dw | +5,000 |
| Porch/Patio/Deck | WD(2), OP | WD, EP | +1,000 | Deck | +2,000 | WD, OP | +1,000 |
| Fireplaces | 1 Fpl. | 1 Fpl. | | None | +5,000 | None | +5,000 |
| Other Items | IngroundPit/Fnce | None | +7,500 | None | +7,500 | None | +7,500 |
| Days on Market | N/A | 74 Days | 0 | 78 Days | 0 | 46 Days | 0 |
| Net Adjustment (Total) | | ☒ + \| ☐ - | $ 8,000 | ☐ + \| ☒ - | $ -6,500 | ☒ + \| ☐ - | $ 10,600 |
| Adjusted Sale Price<br>of Comparables | | Net Adj. 3.5 %<br>Gross Adj. 7.8 % | $ 238,250 | Net Adj. 2.8 %<br>Gross Adj. 13.2 % | $ 223,500 | Net Adj. 4.9 %<br>Gross Adj. 14.5 % | $ 228,600 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s)   Town Records - See Attached Deed

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s)   Town Records

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Town Records | Town Records | Town Records | Town Records |
| Effective Date of Data Source(s) | 06/07/2018 | 06/07/2018 | 06/07/2018 | 06/07/2018 |

Analysis of prior sale or transfer history of the subject property and comparable sales

Subject has not sold within the past three years. Subject has been actively listed for sale in the past twelve months. Estimated value is supported recent comparable sales of similar and competing properties.

Summary of Sales Comparison Approach

All three comparables have been considered. All three sales are located within one mile of subject. Sale #3 is dated beyond 6 months of date of appraisal; all three sales have been chosen for their overall similarity to subject in design and appeal. GLA is adjusted $25 per sf, while FBA is adjusted at $3 per sf. Bathrooms are adjusted at $3,000/$1,500. Exterior amenities are adjusted at $1,000/each. Fireplaces are adjusted at $5,000. Inground Pools are adjusted at $7,500.

See next page for additional comments.
All adjustments were rounded to the nearest $100. Adjustments under $1,000 were not utilized.

Indicated Value by Sales Comparison Approach $ 228,000

Indicated Value by: Sales Comparison Approach $ 228,000    Cost Approach (if developed) $ 261,757    Income Approach (if developed) $

All three approaches to value have been considered. The Income Approach is not developed in that the typical buyer of a single family dwelling does not purchase a single family dwelling for its income stream. The Cost Approach is developed. The Cost Approach supports the Market Approach; however, most consideration is given to the Market Approach.

This appraisal is made ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 228,000   as of   06/07/2018   , which is the date of inspection and the effective date of this appraisal.

**ADDITIONAL COMMENTS**

The sales information obtained was from sources that do not have an interest in the subject property transaction and are "from reliable sources that I believe to be true and correct." All comparable sale properties are chosen from MLS and Town Assessor Records. Subsequently, this information is further verified by the registration of the deed on the land records, the recording of a mortgage on the land records, and an exterior inspection of the sale properties.

Effective age is an estimate based on the overall condition of the property and its components; it is also based on an exterior inspection from the street. Only the exterior of the sale properties was inspected. Information and estimate of effective age for the sale properties is based on an exterior inspection, information noted on the Town Assessor's property card, and MLS sheet, if a MLS sale.

PREDOMINANT VALUE:
The new UAD form does not allow for a range for the predominant value. While the value is stated at $250,000, that is an average and there are several properties valued at less and more than that. Subject is not considered an under improvement for the area.

SALE SELECTION:
Sales beyond the recommended guideline of 6 months and one mile were necessary. All sales are located in similar neighborhoods as subject with no location adjustment warranted. Subject's market is and has been considered stable over the past 12 months therefore no time adjustment is warranted for sales dated within 12 months of date of appraisal.

OTHER:
Some of subject's features are not bracketed by the sales chosen (Age, CAC, Inground Pool). All of subject's features are considered common in the market and not considered adverse to marketability and/or value. It was proven more important by the appraiser to use sales within subject's immediate neighborhood rather than go beyond neighborhood boundaries for a sale to bracket all of subject's features. No adjustment for age is required as the adjustments for differences in this category are made under the quality and condition ratings. Market adjustments are applied. Bulk adjustments are common in this market as we can not derive specific adjustments from a paired sale analysis as properties within subject's market differ from one another.

PHOTOS:
It is typical for appraisers to maintain a photo database of previously taken photos of sales comparables. This database is provided and supported by our common appraisal software. It is common to have off season photos, than that of the season at time of inspection. MLS and appraiser database photos are typically used for interior sites, people in picture, obstructed views or construction. This is common practice in the appraisal industry. The photos are not enhanced in any way to mislead the reader.

---

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Information from recent sales and Assessor's records were used to determine an estimate of land value as though vacant and available for development.

**This was an exterior appraisal only, physical depreciation is estimated and assumed typical of dwellings of the same age.

| ESTIMATED [ ] REPRODUCTION OR [X] REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 50,000 |
|---|---|---|---|---|
| Source of cost data  Local Builders | Dwelling  2,613 | Sq. Ft @ $ 72.50 | =$ | 189,443 |
| Quality rating from cost service  0   Effective date of cost data  0 | 1,308 | Sq. Ft @ $ 30.90 | =$ | 40,417 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | =$ | 10,000 |
| Cost information is developed with information from local builders. | Garage/Carport  440 | Sq. Ft @ $ 25.75 | =$ | 11,330 |
| Land value may exceed 30% of total value; this is common through Connecticut and not | Total Estimate of Cost-New | | =$ | 251,190 |
| considered adverse to marketability. | | | | |

| | Less | Physical | Functional | External | | |
|---|---|---|---|---|---|---|
| | Depreciation | 41,873 | 12,560 | | =$ ( | 54,433  ) |
| | Depreciated Cost of Improvements | | | | =$ | 196,757 |
| | "As-is" Value of Site Improvements | | | | =$ | 15,000 |

| Estimated Remaining Economic Life (HUD and VA only)  50   Years | Indicated Value by Cost Approach | =$ | 261,757 |
|---|---|---|---|

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?   [ ] Yes  [ ] No   Unit type(s)   [ ] Detached  [ ] Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?   [ ] Yes  [ ] No  If Yes, date of conversion

Does the project contain any multi-dwelling units?   [ ] Yes  [ ] No  Data source(s)

Are the units, common elements, and recreation facilities complete?   [ ] Yes  [ ] No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?   [ ] Yes  [ ] No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Exterior-Only Inspection Residential Appraisal Report

File # 3555900001

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**APPRAISER**

Signature

Name  Rebecca Marsele

Company Name  Marsele Appraisal, LLC

Company Address  P.O. Box 911

Simsbury            , CT    06070

Telephone Number  (860) 431-5139

Email Address  becky@marseleappraisal.com

Date of Signature and Report  06/13/2018

Effective Date of Appraisal  06/07/2018

State Certification #  RCR.0001314

or State License # 

or Other (describe) _____ State # _____

State  CT

Expiration Date of Certification or License  04/30/2019

**ADDRESS OF PROPERTY APPRAISED**

62 Quail Run

Torrington              , CT    06790

APPRAISED VALUE OF SUBJECT PROPERTY $  228,000

**LENDER/CLIENT**

Name  No AMC

Company Name  People's United Bank, N.A.

Company Address  850 Main Street

Bridgeport            , CT    06604

Email Address  appraisal.one@peoples.com

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature

Name 

Company Name 

Company Address 

_____

Telephone Number 

Email Address 

Date of Signature 

State Certification # 

or State License # 

State 

Expiration Date of Certification or License 

**SUBJECT PROPERTY**

☐ Did not inspect exterior of subject property

☐ Did inspect exterior of subject property from street

Date of Inspection 

**COMPARABLE SALES**

☐ Did not inspect exterior of comparable sales from street

☐ Did inspect exterior of comparable sales from street

Date of Inspection

File # 3565900001

| | |
|---|---|
| Borrower/Client | Nader |
| Property Address | 62 Quail Run |
| City  Torrington | County  Litchfield    State  CT    Zip Code  06790 |
| Lender  People's United Bank, N.A. | |

Supplemental Addendum [Multi-page]
ADDITIONAL COMMENTS

THE APPRAISAL OF REAL ESTATE, 12th Edition, states " Effective age is the age indicated by the condition and utility of a structure and is based on an appraiser's judgment and interpretation of market perceptions. Even in the same market, similar buildings do not necessarily depreciate at the same rate. The maintenance standards of owners or occupants can influence the pace of building depreciation. If one building is better maintained than other buildings in its market, the effective age of that building may be less than its actual age. If a building is poorly maintained, its effective age may be greater than its actual age. If a building has received typical maintenance, its effective age and actual age may be the same."

Highest and Best Use:

Highest and Best Use is defined as: "The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.  The four criteria the highest and best use must meet are:

legal permissibility
physical possibility
financial feasibility
maximum profitability."

THE DICTIONARY OF REAL ESTATE APPRAISAL, 2002 EDITION
APPRAISAL INSTITUTE

The Highest and Best Use of this parcel as unimproved would be to develop with a single family dwelling that conforms to zoning and the neighborhood.  Subject's Highest and Best Use as improved would be to continue the use as a single family dwelling.


"NON-INFLUENCE AND DODD-FRANK COMPLIANCE
This Appraisal report was completed in compliance with the appraisal independence requirements of the federal Truth in Lending Act. In producing this appraisal, I have not been influenced, nor have been subject to an attempt to influence, the result of this report through coercion, extortion, collusion, compensation, intimidation, or bribery. No estimate regarding the subject property's value, proposed loan amount, or proposed loan-to-value ratio, was provided or communicated to the appraiser except if a purchase agreement was provided for a purchase transaction as required by USPAP Standards Rule 1-5(a)."

# INVOICE

File No. _____ 3555900001

Invoice #     18-864 _____
Invoice Date  June 13, 2018 _____
Fee           425.00 _____
Due Date      _____

Lender or Client:  People's United Bank, N.A. _____

850 Main Street _____

Bridgeport _____ CT ____ 06604 _____

Borrower:  Nader _____

62 Quail Run _____

Torrington _____ CT ____ 06790 _____

| Item | Cost |
|------|------|
| | 425.00 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total Amount Due** | 425.00 |

Terms

Please remit payment to: _____

Marsele Appraisal, LLC _____

P.O. Box 911 _____

Simsbury _____ CT ____ 06070 _____

**Thank you**

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
*(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)*

## Condition Ratings and Definitions

**C1**
The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

*Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

**C2**
The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

**C3**
The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

**C4**
The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

**C5**
The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

**C6**
The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

## Quality Ratings and Definitions

**Q1**
Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

**Q2**
Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

**Q3**
Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

**Q4**
Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

**Q5**
Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

**Q6**
Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

## Definitions of Not Updated, Updated, and Remodeled

**Not Updated**

   Little or no updating or modernization. This description includes, but is not limited to, new homes.
   Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

**Updated**

   The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
   An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure .

**Remodeled**

   Significant finish and/or structural  changes have been made that increase utility and appeal through complete replacement and/ or expansion.
   A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

## Explanation of Bathroom Count

   Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.
   Example:
   3.2 indicates three full baths and two half baths.

AI Ready

Abbreviations Used in Data Standardization Text

File # 3555900001

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-In Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| GlfVw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfil | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-Rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA – Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area,Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## USPAP ADDENDUM

File No. 3555900001

| | |
|---|---|
| Borrower | Nader |
| Property Address | 62 Quail Run |
| City Torrington | County Litchfield | State CT | Zip Code 06790 |
| Lender People's United Bank, N.A. |

### This report was prepared under the following USPAP reporting option:

[X] **Appraisal Report**  This report was prepared in accordance with USPAP Standards Rule 2-2(a).

[ ] **Restricted Appraisal Report**  This report was prepared in accordance with USPAP Standards Rule 2-2(b).

### Reasonable Exposure Time

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 3-6 Months

Exposure time can be defined as the estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.
Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market.
Exposure time and Marketing time are often in line with each other. However in instances were the home has not been properly priced at the time of listing than a homes exposure time may not be the same as the Marketing time. An example of this would be when a home is overpriced. The home may be exposed to the market for a considerable amount of time, ie listing days. Once a homes price drops into a true competitive range for that segment of the Market, then the home can truly market competitively this would be the Marketing time. A home overpriced at the original time of listing, often is exposed to the Market for much longer then a properly priced home. The opposite can be said for a home that has been underpriced that has sold quickly.

### Additional Certifications

I certify that, to the best of my knowledge and belief:

[ ] I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

[X] I HAVE performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.  Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

### Additional Comments

This Certifies that the above referenced appraisal report was completed in compliance with the Appraiser Independence Requirements (AIR) and the USPAP standards. The undersigned appraiser(s) responsible for preparing the above referenced appraisal report hereby certify that the report was completed and the opinion of value developed in accordance with USPAP standards; and at no time did any employee, director, officer, or agent of the lender or any third party acting as joint venture partner, independent contractor, appraisal company appraisal management company or partnering on behalf of the lender, influence or attempt to influence the development, reporting, result or review of the report. The appraiser(s) further certify, I (we) are currently licensed and/or certified by the state in which the property to be appraised is located, and that there have been no sanctions against me (us) for any reason that would impair my ability to perform appraisals.
The undersigned certifies the appraisal report is in compliance with the Appraisal Independence provisions.

| APPRAISER: | SUPERVISORY APPRAISER: (only if required) |
|---|---|
| Signature: *Rebecca Marsele* | Signature: |
| Name: Rebecca Marsele | Name: |
| Date Signed: 06/13/2018 | Date Signed: |
| State Certification #: RCR.0001314 | State Certification #: |
| or State License #: | or State License #: |
| or Other (describe)_____ State # ____ | State: |
| State: CT | Expiration Date of Certification or License: |
| Expiration Date of Certification or License: 04/30/2019 | Supervisory Appraiser Inspection of Subject Property: |
| Effective Date of Appraisal: 06/07/2018 | [ ] Did Not  [ ] Exterior-only from Street  [ ] Interior and Exterior |

USPAP 2014                                                         AI Ready

**DIMENSION LIST ADDENDUM**

File No.

| | |
|---|---|
| Borrower or Owner | Nader |
| Property Address | 62 Quail Run |
| City  Torrington | County  Litchfield    State  CT    Zip Code  06790 |
| Lender or Client | People's United Bank, N.A. |

**Gross Living Area (GLA)**  2,613  s.f.

**Gross Building Area (GBA)**  4,837  s.f.

| Areas | Square Footage | | |
|---|---|---|---|
| Basement | 1,294 | s.f.  27 | % of GBA |
| Level 1 | 1,304 | s.f.  27 | % of GBA |
| Level 2 | 1,309 | s.f.  27 | % of GBA |
| Level 3 | | s.f. | % of GBA |
| Garage | 522 | s.f.  11 | % of GBA |
| Other | 408 | s.f.  8 | % of GBA |

| Area Dimensions | | | | Type of Area | | | | Level | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Measurements | | Factor | Area | Living | Bsmnt | Garage | Other | One | Two | Three |
| 35.00 x 28.00 | x | 1.00 | = 980 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 24.00 x 12.00 | x | 1.00 | = 288 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 2.00 | x | 1.00 | = 26 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 35.00 x 28.00 | x | 1.00 | = 980 | ☒ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 24.00 x 12.00 | x | 1.00 | = 288 | ☒ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 13.00 x 2.00 | x | 1.00 | = 26 | ☒ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 10.00 x 1.00 | x | 1.00 | = 10 | ☒ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 35.00 x 28.00 | x | 1.00 | = 980 | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| 23.00 x 22.00 | x | 0.65 | = 329 | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| 23.00 x 22.00 | x | 1.00 | = 506 | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 1.00 x 16.00 | x | 1.00 | = 16 | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 36.00 x 6.00 | x | 1.00 | = 216 | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| 16.00 x 12.00 | x | 1.00 | = 192 | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ___ x ___ | x | ___ | = ___ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

PHOTOGRAPH ADDENDUM

File # 3555900001

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | Nader | | | | | |
| Property Address | 62 Quail Run | | | | | |
| City | Torrington | County | Litchfield | State | CT | Zip Code | 06790 |
| Lender | People's United Bank, N.A. | | | | | |



**FRONT OF SUBJECT PROPERTY**

Subject Front

62 Quail Run


**REAR OF SUBJECT PROPERTY**




**STREET SCENE**

Subject Street

62 Quail Run

COMPARABLES PHOTO PAGE 35 of 49 M

| | | |
|---|---|---|
| Borrower/Client | Nader | |
| Property Address | 62 Quail Run | |
| City Torrington | County Litchfield | State CT  Zip Code 06790 |
| Lender People's United Bank, N.A. | | |

File # 3555900001



**Comparable Sale 1**

154 Hillandale Blvd

| Torrington | CT | 06790 |
|---|---|---|
| Date of Sale: | s12/17;c12/17 | |
| Sale Price: | 230,250 | |
| Sq. Ft.: | 2,530 | |
| $ / Sq. Ft.: | 91.01 | |



**Comparable Sale 2**

17 Warder Rd

| Torrington | CT | 06790 |
|---|---|---|
| Date of Sale: | s05/18;c04/18 | |
| Sale Price: | 230,000 | |
| Sq. Ft.: | 2,947 | |
| $ / Sq. Ft.: | 78.05 | |



**Comparable Sale 3**

59 Tall Tree Ln

| Torrington | CT | 06790 |
|---|---|---|
| Date of Sale: | s08/17;c07/17 | |
| Sale Price: | 218,000 | |
| Sq. Ft.: | 2,508 | |
| $ / Sq. Ft.: | 86.92 | |

LOCATION MAP

| | | | | |
|---|---|---|---|---|
| Borrower/Client | Nader | | | File # 3555900001 |
| Property Address | 62 Quail Run | | | |
| City | Torrington | County Litchfield | State CT | Zip Code 06790 |
| Lender | People's United Bank, N.A. | | | |



| | | | | |
|---|---|---|---|---|
| Borrower/Client | Nader | | | File # 3555900001 |
| Property Address | 62 Quail Run | | | |
| City Torrington | County Litchfield | State CT | Zip Code 06790 | |
| Lender People's United Bank, N.A. | | | | |

STATE OF CONNECTICUT ✦ DEPARTMENT OF CONSUMER PROTECTION

Be it known that

## REBECCA E MARSELE

has been certified by the Department of Consumer Protection as a licensed

## CERTIFIED RESIDENTIAL REAL ESTATE APPRAISER

## License # RCR.0001314

Effective: 05/01/2018
Expiration: 04/30/2019

Michelle Seagull, Commissioner

| | |
|---|---|
| Borrower/Client  Nader | Building Sketch    File #  3555900001 |
| Property Address  62 Quail Run | |
| City  Torrington    County  Litchfield    State  CT    Zip Code  06790 | |
| Lender  People's United Bank, N.A. | |



| Borrower/Client | Nader | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 62 Quail Run | | | | | |
| City | Torrington | County | Litchfield | State | CT | Zip Code | 06790 |
| Lender | People's United Bank, N.A. | | | | | |



File # 3555900001

| Borrower/Client | Nader | | | | |
|---|---|---|---|---|---|
| Property Address | 62 Quail Run | | | | |
| City | Torrington | County | Litchfield | State CT | Zip Code 06790 |
| Lender | People's United Bank, N.A. | | | | |

044450

VOL 488 PAGE 069

## STATUTORY WARRANTY DEED

RICHARD SZABO of the Town of Torrington, County of Litchfield, and State of Connecticut, and THOMAS E. SZABO of the Town of Torrington, County of Litchfield, and State of Connecticut, for consideration paid, grants to JOSEPH C. NADER and RANDI NADER, as Joint Tenants, of the Town of Torrington, County of Litchfield, and State of Connecticut, with WARRANTY COVENANTS

That certain piece or parcel of land located on the easterly side of a public highway known as Torringford West Street in the Town of Torrington, County of Litchfield, State of Connecticut, shown as Lot No. 21 on a map entitled "Final Subdivision Plan Eagle Ridge Torringford West Street & Torringford Street Torrington, Connecticut Scale 1"=40' date January, 1988 Sheet 1 of 3 2 of 3 3 of 3 Job No. T-924 William A. Berglund Licensed Land Surveyor Torrington, Connecticut" which map is recorded in the Torrington Land Records as Map No. 3249; 3250 and 3251 respectively.

Said premises are conveyed together with a private right of way and easement for all highway purposes, over and across the roads known as Eagle Ridge and Quail Run, shown on the above referenced map, for the purpose of ingress to and egress from the premises conveyed herein, said right of way and easement to be exercised in common with owners of the other lots in the subdivision shown on the above referenced map, until such time as the said roads known as Eagle Ridge and Quail Run are fully accepted by the City of Torrington as a Town Road.

Said premises are subject to Planning and Zoning Commission stipulations as referred to and set forth on said map. Said premises are also subject to a Declaration of Restrictions dated July 26, 1988, and filed in the Torrington Land Records at Volume 440, page 584.

Said premises are subject to an easement to Connecticut Light and Power Company dated August 5, 1988, and recorded on April 29, 1989, at Volume 453, page 1011 of the Torrington Land Records.

Said premises are subject to any and all provisions of any ordinance, municipal regulation or public or private law.

Signed this 21st day of September, 1990

Signed, Sealed and Delivered:
In the Presence Of:

_Paul R. Griffin_

Paul R. Griffin

_Aurora M. Rouleau_

Aurora M. Rouleau

_Richard Szabo_

Richard Szabo

_Richard Szabo_

Thomas E. Szabo, acting herein by Richard Szabo, his Attorney in Fact

STATE OF CONNECTICUT)
                                          ) ss. Torrington
COUNTY OF LITCHFIELD)

The foregoing instrument was acknowledged before me this 21st day of September, 1990, by Richard Szabo, individually and as attorney in fact for Thomas E. Szabo.

Commissioner of the Superior Court

Grantees Address:
231 Brentwood Road
Bristol, CT 06010

Received September 21, 1990 at
3:17 P.M., recorded by

_Stella Cory_

Asst. Town Clerk

CONVEYANCE TAX COLLECTED
ANDO E. BONETTI
52.25   CITY OF TORRINGTON
232.50   STATE OF CONNECTICUT

| Borrower/Client | Nader | | | | | | File # 3555900001 |
| Property Address | 62 Quail Run | | | | | | |
| City | Torrington | | County | Litchfield | State | CT | Zip Code 06790 |
| Lender | People's United Bank, N.A. | | | | | | |

Page 1 of 4

 Print

# ENGAGEMENT LETTER

| **Client:** | Peoples United Bank, N.A. | **Lender:** | Peoples United Bank, N.A. |
| **Address:** | 850 Main St. 7th Floor Bridgeport, CT 06604 | **Address:** | 850 Main St. 7th Floor Bridgeport, CT 06604 |
| **Phone:** | 203-338-4139 | | |
| **Fax:** | | | |
| **Email:** | GRP-FNCNOTIFICATIONS@peoples.com | | |

## SERVICE PROVIDER INFORMATION

| **Service Provider:** | Rebecca Marsele |
| **Address:** | PO Box 911 Simsbury, CT 06070 |
| **Phone:** | 860-431-5139 |
| **Fax:** | |
| **Email:** | becky@marseleappraisal.com |

## LOAN INFORMATION

| **Document ID:** | 20180301-1491-2 |
| **Loan Number :** | 3555900001 |
| **LockBox Combo:** | |
| **Processor Name:** | n/a n/a |
| **Processor Email:** | n/a |
| **Processor Phone:** | n/a |
| **Processor Phone Ext:** | n/a |
| **Borrower Name:** | Joseph Nader |
| **Order Date:** | 06/05/2018 9:34AM |
| **Inspection Date:** | |

https://www.appraisalport.com/OrderDetail/EngagementLetter?orderId=49130435          6/5/2018

Appraisal Management                                    File # 3555900001

| | |
|---|---|
| Borrower/Client | Nader |
| Property Address | 62 Quail Run |
| City | Torrington | County | Litchfield | State | CT | Zip Code | 06790 |
| Lender | People's United Bank, N.A. |

Page 2 of 4

| | |
|---|---|
| **Due from Service Provider:** | 06/12/2018 11:59PM |
| **Closing Date:** | |
| **Due to Customer:** | n/a |
| **Property Address:** | 62 Quail Run<br>TORRINGTON, CT 06790 |
| **Loan Purpose:** | Workout |
| **Loan Classification:** | Tier 0 |
| **Sales Price:** | XXXXX |
| **Property Type:** | SFR Detached |
| **Occupancy:** | Primary Residence |
| **Service:** | 2055 Exterior Residential |
| **Requires 1004MC:** | NO |
| **Sub Loan Type:** | n/a |
| **Government Case Number:** | n/a |
| **Service Provider Fee:** | $425.00 |

## CONTACT INFORMATION

| Contact Name | Address | City | State | Zip | County | Phone Number (ext) | Alternate Phone Number (ext) | Email | Cell Phone | Contact Type |
|---|---|---|---|---|---|---|---|---|---|---|
| Joseph Nader | | | | | | | | | | Borrower |

## INSTRUCTIONS

**Acknowledgment of Terms :**

This letter, along with the attached "Assignment Summary" will confirm your engagement to prepare a real estate appraisal on the referenced property on behalf of People's United Bank, N.A. (the "Bank"). This engagement is subject to the terms of the Appraiser Agreement between you and the Bank (the "Agreement"), which terms are incorporated herein by reference.

By accepting this engagement, you agree to the following (all of which is more fully set forth in the Agreement):

1. Acknowledge acceptance of appraisal order within 24 hours.

2. Contact borrower or contact person within 24 hours of receipt of assignment for appointment.

3. Accept the fee stated in the Bank's Fee Schedule.

https://www.appraisalport.com/OrderDetail/EngagementLetter?orderId=49130435          6/5/2018

Borrower/Client  Nader
Property Address  62 Quail Run
City  Torrington       County  Litchfield     State  CT     Zip Code  06790
Lender  People's United Bank, N.A.

File #  3555900001

Page 3 of 4

4. Deliver the appraisal report by the due date stated in the Assignment Summary and deliver appraisal report in Enhanced AI Ready Format.

5. Agree to contact the Bank with any updates, or concerns.

In accepting this assignment you certify that you are an appraiser competent to prepare this appraisal report and the appraisal report will be completed and signed by the appraiser accepting the order.

Representatives of People's United Bank, N.A. may perform an administrative or technical review of the report. Your full cooperation in the review process is deemed to be an integral part of this valuation assignment.

It is mutually agreed that your completed report, in the specified number of copies, will be delivered to the undersigned on or before the date specified below, and that the total fee (including expenses) will not exceed the fee specified below.

You will maintain the confidentiality and privacy of customer information obtained in the course of this assignment in compliance with the Agreement.

Please include a signed copy of this letter as an addendum to the completed report.

Sincerely,

Residential Appraisal Department

Accepted By: _____

Printed Name: Rebecca Mark

Date: G-5-18

_____

_____

_____

Assignment Summary

Property Location

Property Type:

Property Description:

Improvement Size:

AI Ready PDF Generated on 06/14/2018 9:54:23 AM

EXHIBIT C

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **Joseph C Nader** |
| | First Name    Middle Name    Last Name |
| Debtor 2 | **Randi S Nader** |
| (Spouse if, filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF CONNECTICUT |
| Case number (if known) | _____ |

☐ Check if this is an amended filing

Official Form 108

# Statement of Intention for Individuals Filing Under Chapter 7    12/15

**If you are an individual filing under chapter 7, you must fill out this form if:**
■ creditors have claims secured by your property, or
■ you have leased personal property and the lease has not expired.
**You must file this form with the court within 30 days after you file your bankruptcy petition or by the date set for the meeting of creditors, whichever is earlier, unless the court extends the time for cause. You must also send copies to the creditors and lessors you list on the form**

**If two married people are filing together in a joint case, both are equally responsible for supplying correct information. Both debtors must sign and date the form.**

**Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known).**

**Part 1:    List Your Creditors Who Have Secured Claims**

1. **For any creditors that you listed in Part 1 of Schedule D: Creditors Who Have Claims Secured by Property (Official Form 106D), fill in the information below.**

| Identify the creditor and the property that is collateral | What do you intend to do with the property that secures a debt? | Did you claim the property as exempt on Schedule C? |
|---|---|---|
| Creditor's name: **Mr Cooper**<br><br>Description of property securing debt: **62 Quail Run Torrington, CT 06790-2549  Litchfield County** | ■ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement.*<br>☐ Retain the property and [explain]:<br>_____ | ☐ No<br><br>■ Yes |
| Creditor's name: **Peoples United Bank**<br><br>Description of property securing debt: **62 Quail Run Torrington, CT 06790-2549  Litchfield County** | ■ Surrender the property.<br>☐ Retain the property and redeem it.<br>☐ Retain the property and enter into a *Reaffirmation Agreement.*<br>☐ Retain the property and [explain]:<br>_____ | ☐ No<br><br>■ Yes |

**Part 2:    List Your Unexpired Personal Property Leases**
**For any unexpired personal property lease that you listed in Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G), fill in the information below. Do not list real estate leases. Unexpired leases are leases that are still in effect; the lease period has not yet ended. You may assume an unexpired personal property lease if the trustee does not assume it. 11 U.S.C. § 365(p)(2).**

| Describe your unexpired personal property leases | Will the lease be assumed? |
|---|---|

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

| Fill in this information to identify your case: | | |
|---|---|---|
| Debtor 1 | **Joseph C Nader** | |
| | First Name                Middle Name                Last Name | |
| Debtor 2 | | |
| (Spouse if, filing) | First Name                Middle Name                Last Name | |
| United States Bankruptcy Court for the: | DISTRICT OF CONNECTICUT | |
| Case number (if known) | _____ | ☐ Check if this is an amended filing |

## Official Form 106C

# Schedule C: The Property You Claim as Exempt                     4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim.** One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.

### Part 1:    Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ☐ You are claiming state and federal nonbankruptcy exemptions.  11 U.S.C. § 522(b)(3)

   ☑ You are claiming federal exemptions.  11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own Copy the value from *Schedule A/B* | Amount of the exemption you claim *Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Debtor 1 Exemptions** | | | |
| **62 Quail Run Torrington, CT 06790-2549 Litchfield County** Line from *Schedule A/B*: **1.1** | $228,000.00 | ☑ $2,586.30 ☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(1) |
| **2008 Subaru Impreza 985000 miles KBB Value $2,223.00 No Loan Balance** Line from *Schedule A/B*: **3.2** | $2,223.00 | ☑ $1,111.50 ☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(2) |
| **1 Bedroom Set, bar stools, twin bed, dishes, Refrigerator, non-functioning hot tub and pool table, assorted lamps, tables and chairs** Line from *Schedule A/B*: **6.1** | $1,000.00 | ☑ $500.00 ☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(3) |
| **Iphone 8 plus, Iphone 7** Line from *Schedule A/B*: **7.1** | $500.00 | ☑ $250.00 ☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(3) |
| **Average Clothing: Outerwear, Casualwear, Businesswear, Footwear** Line from *Schedule A/B*: **11.1** | $500.00 | ☑ $500.00 ☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(3) |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Breitling Men's Watch**<br>Line from *Schedule A/B*: **12.1** | $100.00 | ■ $100.00<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(4) |
| **2 family dogs**<br>Line from *Schedule A/B*: **13.1** | $0.00 | ■ $0.00<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(5) |
| **Cash**<br>Line from *Schedule A/B*: **16.1** | $20.00 | ■ $20.00<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(5) |
| **Checking: Bank of America**<br>Line from *Schedule A/B*: **17.1** | $1,541.06 | ■ $770.53<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(5) |
| **Savings: Bank of America**<br>Line from *Schedule A/B*: **17.2** | $41.98 | ■ $20.99<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(5) |
| **Ameritrade online trade account**<br>Line from *Schedule A/B*: **18.1** | $151.87 | ■ $151.87<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(5) |
| **401k: 401K with Lincoln Financial Group through RAM Welding Company, Inc.**<br>**"Not Property of the Estate Pursuant to 11 USC Sect 541(c)(2) and C.G.S. Sect 52-321(a)"**<br>Line from *Schedule A/B*: **21.1** | $62,110.74 | ■ $62,110.74<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(12) |
| **401k: 401K with Haynes Group Incorporated**<br>**"Not Property of the Estate Pursuant to 11 USC Sect 541(c)(2) and C.G.S. Sect 52-321(a)"**<br>Line from *Schedule A/B*: **21.2** | $2,243.35 | ■ $2,243.35<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(12) |
| **Allstate Financial Universal Life Insurance**<br>**Death Benefit Amount $250,000**<br>**Cash Value = $1.677.62**<br>**Beneficiary: Spouse**<br>Line from *Schedule A/B*: **31.1** | $1,677.62 | ■ $1,677.62<br>☐ 100% of fair market value, up to any applicable statutory limit | 11 U.S.C. § 522(d)(5) |

3. **Are you claiming a homestead exemption of more than $160,375?**
(Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.)

■ No

☐ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

☐ No

☐ Yes

| Fill in this information to identify your case: |
|---|

Debtor 1 _____
 First Name          Middle Name          Last Name

Debtor 2 **Randi S Nader**
(Spouse if, filing)  First Name          Middle Name          Last Name

United States Bankruptcy Court for the:   DISTRICT OF CONNECTICUT

Case number _____
(if known)

☐ Check if this is an
   amended filing

## Official Form 106C
# Schedule C: The Property You Claim as Exempt
**4/16**

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.

| **Part 1:** | Identify the Property You Claim as Exempt |
|---|---|

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

   ☐ You are claiming state and federal nonbankruptcy exemptions.   11 U.S.C. § 522(b)(3)

   ■ You are claiming federal exemptions.   11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Debtor 2 Exemptions** | | | |
| **62 Quail Run Torrington, CT 06790-2549 Litchfield County**<br>Line from *Schedule A/B*: **1.1** | $228,000.00 | ■ $2,586.31<br>☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(1)** |
| **2008 Subaru Impreza 985000 miles KBB Value $2,223.00 No Loan Balance**<br>Line from *Schedule A/B*: **3.2** | $2,223.00 | ■ $1,111.50<br>☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(2)** |
| **1 Bedroom Set, bar stools, twin bed, dishes, Refrigerator, non-functioning hot tub and pool table, assorted lamps, tables and chairs**<br>Line from *Schedule A/B*: **6.1** | $1,000.00 | ■ $500.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(3)** |
| **Iphone 8 plus, Iphone 7**<br>Line from *Schedule A/B*: **7.1** | $500.00 | ■ $250.00<br>☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(3)** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

| Brief description of the property and line on Schedule A/B that lists this property | Current value of the portion you own Copy the value from Schedule A/B | Amount of the exemption you claim Check only one box for each exemption. | Specific laws that allow exemption |
|---|---|---|---|
| **Average Clothing: Outerwear, Casualwear, Footwear** Line from Schedule A/B: **11.2** | $500.00 | ■ $500.00 <br> ☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(3)** |
| **Miscellaneous Costume Jewelry i.e. Earrings, rings, necklaces, bracelets** Line from Schedule A/B: **12.2** | $65.00 | ■ $65.00 <br> ☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(4)** |
| **Checking: Bank of America** Line from Schedule A/B: **17.1** | $1,541.06 | ■ $770.53 <br> ☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(5)** |
| **Savings: Bank of America** Line from Schedule A/B: **17.2** | $41.98 | ■ $20.99 <br> ☐ 100% of fair market value, up to any applicable statutory limit | **11 U.S.C. § 522(d)(5)** |

3. **Are you claiming a homestead exemption of more than $160,375?**
   (Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.)

   ■ No

   ☐ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

       ☐ No

       ☐ Yes